George H. JONES and Betty A. Jones, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 90–4322.

United States Court of Appeals, Fifth Circuit.

April 2, 1991.

---

Jerrold E. Miertschin, John S. Klotsche, Baker & McKenzie, Dallas, Tex., for petitioners-appellants.

Janet A. Bradley, David E. Carmack, U.S. Dept. of Justice, Tax Div., Shirley D. Peterson, Gary R. Allen, Chief Asst. Attys. Gen., Abraham N.M. Shashy, Jr., Ch. Cnsl., IRS, Washington D.C., for respondent-appellee.

Before GOLDBERG, JOLLY and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

In a notice dated December 8, 1987, the Commissioner of Internal Revenue (the "Commissioner") determined deficiencies in George H. and Betty A. Jones' (collectively hereinafter referred to as "Taxpayers") income tax for the taxable years ending December 31, 1981, 1982 and 1983, in the amounts of $7,355, $37,513, and $37,031 respectively. The case was subsequently tried before the tax court. Finding that Jones failed to prove he was a bona fide resident of Japan during the applicable period, the tax court determined deficiencies in Taxpayers' income tax in the amounts of $3,081 for 1981, $20,208 for 1982, and $15,661 for 1983. Taxpayers appeal this decision. Because we find that the tax court erred as matter of law in finding that Jones was not a bona fide resident of Japan and because we find that Jones' tax home for the relevant years was in Japan, we reverse.

## I. FACTS AND PROCEEDINGS BELOW

When George H. Jones ("Jones") retired from the air force in 1970, he entered into an employment agreement with International Air Service Company, Ltd. ("IASCO"), a California corporation in the business of furnishing flight crew personnel to aircraft operators. Pursuant to a contract between IASCO and Japanese Air Lines Co., Ltd. ("JAL"), Jones was assigned exclusively to JAL, flying out of Tokyo, Japan. While in Japan on this initial assignment, Taxpayers and their four children resided in a rented house in Japan.

Jones served with JAL, based in Tokyo, from 1971 through March 1972. On March

31, 1972, JAL furloughed Jones. Jones moved his family and belongings back to San Antonio, Texas, so he could attempt to obtain interim employment. On January 1, 1973, JAL recalled Jones to active duty and reassigned him to JAL's Tokyo base. Although he then moved back to Tokyo, his wife remained in San Antonio so that their son could graduate from high school, after which time Mrs. Jones and their youngest daughter anticipated joining Jones in Tokyo. During both his first and second assignment in Tokyo, Jones' flights consisted of routes within Japan and between Japan and Asia.

In March 1974 JAL reassigned Jones to Anchorage, Alaska, its only base located in the United States. Therefore, after Taxpayers' son graduated from high school in San Antonio, Mrs. Jones and Taxpayers' youngest daughter also moved to Anchorage. Taxpayers' youngest daughter only lived in Anchorage until she left for college. After moving to Anchorage, Mrs. Jones began a career for the first time. She eventually went to work for a newly-formed bank and worked directly for the chairman of the bank.

On March 3, 1980, and continuing through the years in issue, JAL transferred Jones back to Tokyo. Although Mrs. Jones had the opportunity to move to Tokyo as well, she decided to remain in Anchorage and pursue her own career until Jones' expected retirement in 1988. She continued to occupy the townhome that Taxpayers' jointly owned in Anchorage. Taxpayers filed joint United States income tax returns for the years in question, 1981, 1982, and 1983.

When he moved back to Tokyo, Jones moved into the Hotel Nikko Narita (the "Hotel"), where he stayed until his retirement in 1988. Jones apparently elected to stay at the Hotel instead of renting an apartment or a house for reasons of convenience, economy, and the society of other JAL crewmembers who also lived in the Hotel. He checked into and out of the Hotel in accordance with his schedule, and left his personal belongings in storage at the Hotel when he was away.

Although Taxpayers tried to see each other as frequently as possible, Jones was only able to fly on JAL with discount tickets for approved vacation periods. Unlike many domestic air carriers, JAL did not allow its flight crew members the privilege of flying free anytime a seat was available. This same policy applied to Mrs. Jones.

Although Jones did not own an automobile in Japan during the years in issue, he had renewed his Japanese driver's license so that he could occasionally borrow a car or rent a car when his family came to visit him. Jones also maintained his Alaska driver's license and two cars in the United States were co-titled in his name. Although he did not maintain a bank account in Japan and held no Japanese-based credit cards, he did maintain joint bank accounts with his wife in Alaska and San Antonio, and held U.S.-based credit cards. During the years in question, Jones was registered to vote in Alaska and voted absentee in United States elections.

Jones held a commercial multi-entry visa, renewable every four years, which allowed him to stay in Japan a maximum of three years per entry. The only limitation was a requirement that he leave Japan at least once every three years. Since his profession dictated frequent trips outside Japan, this was not a problem for Jones.

Jones paid both Japanese and United States income taxes for the years at issue. Jones' Japanese income tax returns were prepared at his expense by a Japanese accountant in Japan. After moving to Japan, Jones received a dividend check, representing a 1981 payment under the Alaska Permanent Fund Distribution Program. Because entitlement was based on Alaskan residence, Jones returned the check, explaining that he was no longer an Alaska resident.

During the years in issue, JAL assigned Jones to flights which were either intercontinental between Japan and the United States, or intracontinental segments of such international flights within Japan and the United States. Jones had no control over which flights he was scheduled to fly. During the relevant period, Jones spent less than 165 nights a year in Japan. Since

Anchorage was JAL's only U.S. base, and one of the normal stopover cities on Japan/U.S. routes, Jones' job required that he be in Anchorage frequently. When overnight in Anchorage, Jones stayed in the townhouse co-owned by Taxpayers.

During the years in issue, Jones did not have extensive contact with Japanese culture. He did visit a local Japanese doctor for medical attention and he participated in certain recreational activities, including jogging and playing golf. Jones socialized with co-workers also living at the Hotel and occasionally drove into Tokyo for dinner and entertainment.

On Taxpayers' joint 1981 federal income tax return, they claimed a deduction of $5,590 under Section 913 of the Internal Revenue Code (the "Code"). On their 1982 and 1983 joint returns, Taxpayers claimed exclusions of $76,050 and $81,272, respectively, under Section 911 of the Code. The Commissioner issued a statutory notice of deficiency determining deficiencies in each year resulting from, among other items, the disallowance of taxpayer's Section 913 deduction in 1981, and their Section 911 exclusions in 1982 and 1983. The Taxpayers timely filed a petition with the tax court for a redetermination of these deficiencies. The tax court held that Jones was not a bona fide resident of Japan during the applicable period and therefore was not entitled to section 913 deductions and section 911 exclusions. Jones now appeals this decision.

## II. DISCUSSION

The Tax Court's conclusion regarding Jones' residency is a conclusion of law or at least a determination of a mixed question of law and fact. As such, it is reviewable de novo and this court may freely substitute its judgment for that of the tax court. *Sochurek v. Commissioner*, 300 F.2d 34, 37 (7th Cir.1962).

The only issue this court must address is whether Jones was a "qualified individual" within the meaning of sections 913 and 911 of the Code.[1] To be entitled to the deduction available under Code Section 913[2] for certain expenses while living abroad, and the exclusion available under Code Section 911[3] of foreign earned income, a taxpayer had to have a tax home in a foreign country and demonstrate (1) that he had either been a "bona fide resident" of a foreign country for an uninterrupted period including an entire taxable year (the "bona fide residency test"), or (2) that he had been physically present in a foreign country for a certain period of time (the "physical presence test"). *See* §§ 913(a)(1) and 911(d)(1)(A); 26 C.F.R. §§ 1.913–1, 1.911–2(a); *see also Lemay v. Commissioner*, 837 F.2d 681, 682 (5th Cir.1988). Jones concedes that he does not meet the "physical presence test." Therefore, Jones must show that his tax home was in Japan and that he was a bona fide resident of Japan during the applicable period.

■ Since the tax court below only addressed the issue of whether Jones was a bona fide resident of Japan, we will begin our discussion with that inquiry. Neither section 913 nor section 911 defines the term "bona fide resident." Residence is an elu-

---

1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.

2. Section 913 of the Code, as in effect in 1981, permitted a deduction for certain expenses incurred by a taxpayer living abroad. Section 913 allowed the taxpayer to deduct a cost-of-living differential, hardship area deduction, and housing, schooling, and home leave travel expenses. § 913(b). This deduction could not, however, exceed taxpayer's net foreign source earned income while his tax home was in a foreign country. § 913(c).

3. As part of the Economic Recovery Tax Act of 1981, Congress repealed Code Section 913 for tax years after 1981 and replaced it with a revised section 911. Pub.L. No. 97–34, 95 Stat. 172, Sec. 111. Congress completely revised section 911 for tax years after 1981, replacing the existing system of a deduction for excess living costs with an exclusion for foreign earned income and providing for an individual's election to exclude a portion of his income and his housing costs. § 911(a). It allows a "qualified individual" living abroad to exclude foreign earned income from gross income of up to $75,000 in 1982 and $80,000 in 1983. § 911(a)(1).

sive expression peculiarly related to the facts in any given case. *Sochurek,* 300 F.2d at 37. As the Ninth Circuit succinctly stated, "residence ... has an evasive way about it, with as many colors as Joseph's coat." *Weible v. United States,* 244 F.2d 158, 163 (9th Cir.1957). This court must determine residence in light of congressional intent, which was to encourage foreign trade by encouraging foreign employment for citizens of the United States, and to place them in an equal position with citizens of other countries going abroad who are not taxed by their own countries. *See* S.Rep. No. 781, 82d Cong., 1st Sess. 52, 53 (1951), U.S.Code Cong. & Admin.Serv.1951, p. 1781; H.R.Rep. No. 1463, 95th Cong., 2d Sess. 7 (1978); H.R.Rep. No. 201, 97th Cong., 1st Sess. 59, 60 (1981); S.Rep. No. 144, 97th Cong., 1st Sess. 35, 36 (1981), U.S.Code Cong. & Admin.News 1981, p. 105; *see also Swenson v. Thomas,* 164 F.2d 783, 784 (5th Cir.1947); *Downs v. Commissioner,* 166 F.2d 504, 507 (10th Cir.), *cert. denied,* 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759 (1948).

■ For purposes of sections 913 and 911, the test of a taxpayer's bona fide residence in a foreign country is the test of alien residence established in Code Section 871. *Richard v. Commissioner,* 55 T.C.M. (CCH) 864 (1988); *see also* 26 C.F.R. §§ 1.913–2(b), 1.911–2(c). Treasury Regulation Section 1.871–2(b) provides in pertinent part that:

> An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax.... One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned.

26 C.F.R. § 1.871–2(b). Residence is therefore much less than domicile which requires an intent to make a fixed and permanent home. *Dawson v. Commissioner,* 59 T.C. 264, 270 (1972) ("it is possible to be a bona fide resident of one country while retaining one's domicile in another").

■ When determining whether a taxpayer was a bona fide resident of a foreign country, courts consider a number of objective factors, first enunciated in *Sochurek v. Commissioner,* 300 F.2d 34 (7th Cir.1962). These factors include:

(1) intention of the taxpayer;

(2) establishment of his home temporarily in the foreign country for an indefinite period;

(3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment;

(4) physical presence in the foreign country consistent with his employment;

(5) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time;

(6) assumption of economic burdens and payment of taxes to the foreign country;

(7) status of resident contrasted to that of transient or sojourner;

(8) treatment accorded his income tax status by his employer;

(9) marital status and residence of his family;

(10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time;

(11) good faith in making his trip abroad; whether for purpose of tax evasion.

*Sochurek,* 300 F.2d at 38. While all these factors may not be present in every situation, those appropriate should be properly considered and weighed. *Id.* A taxpayer must offer "strong proof" of bona fide residence in a foreign country to qualify for the foreign earned income exclusion

under section 911. *Schoneberger v. Commissioner*, 74 T.C. 1016, 1024 (1980).

In upholding the Commissioner's assessment, the tax court seemed to place particular emphasis on the fact Jones chose to live in the Hotel, rather than renting an apartment or a home in Japan, and the fact that Jones' wife chose to live in Anchorage, rather than give up her job and move to Japan with her husband. The tax court also noted that Jones had a number of ties to the United States, while he remained relatively unassimilated into the Japanese community. The tax court's analysis, however, overlooks the other *Sochurek* factors.

First, the tax court failed to consider Jones intent. Jones obviously intended to become a resident of Japan and therefore he accordingly returned to the State of Alaska a dividend check which was based on Alaskan residence. A taxpayer's intent plays perhaps the most important part in determining the establishment and maintenance of a foreign residence. *Dawson*, 59 T.C. at 268.

Jones established his home in Japan, presumably for the remainder of his career. Jones' job as a pilot was ongoing and both JAL and Jones intended Jones to live and work in Japan until his retirement. Therefore, Jones purpose for being in Japan was of such a nature that an extended stay was necessary. Due to his flight schedule, JAL required his physical presence in Japan and such presence was consistent with his employment.

In addition, Jones argues that he should not be penalized because the economic realities of Japan lead him to choose to live in the Hotel, instead of renting an apartment or buying a home. The Commissioner and the tax court seemed bothered by the apparent temporary nature of a hotel, but it is not necessary for a taxpayer to establish a fixed, permanent place of abode in order to be a "resident" of a foreign country. *Swenson v. Thomas*, 164 F.2d 783, 785 (5th Cir.1947).

Furthermore, Jones was apparently only away from his home in Japan when his business required it, or when he was on vacation. The fact that Jones was able to stay at his home in Anchorage during flights was merely fortuitous and should not be held against Jones. If JAL had not previously based Jones in Anchorage, Taxpayers would not have owned property there. In addition, if JAL had scheduled Jones to fly only Asian trips, as he had done when he was previously assigned to Japan, Jones would not have had occasion to layover in Anchorage. Nevertheless, business and vacation trips to the United States should not affect Jones residency. *See, e.g., Schoneberger v. Commissioner*, 74 T.C. 1016, 1025 (1980) (taxpayer's employment as a pilot flying international flights "required that, wherever his residence was, he would spend substantial amounts of time away from it"); *Weible v. United States*, 244 F.2d 158, 166–67 (9th Cir.1957) (frequent trips to the United States did not affect taxpayer's status as a foreign resident where on each visit it was his intention to return to Spain).

Jones paid resident Japanese income taxes. Jones' Japanese income tax returns were prepared at his expense by a Japanese accountant. Both JAL and IASCO viewed Jones as a resident of Japan for Japanese income tax purposes. In fact, JAL required IASCO to withhold Japanese income taxes from Jones' payroll checks. The last *Sochurek* factor also arguably supports Jones' claim to bona fide residency because the Commissioner has never suggested that Jones took the job in Japan for the purposes of tax evasion. *See Sochurek*, 300 F.2d at 38.

Both in his briefs and during oral argument, the Commissioner seemed to rely heavily on the fact that Jones' wife did not move to Japan during his last assignment to Tokyo. The Commissioner seems to argue that Taxpayers' should be punished because Mrs. Jones chose to stay in Anchorage and pursue a career, rather than move to Japan with her husband. When JAL reassigned Jones to Japan in 1980, Taxpayers' children were all away at school or married. For the first time in a number of years, Mrs. Jones was free to devote herself to a career. She would most likely not have been able to find comparable em-

ployment if she had joined her husband in Japan.

We are besieged with cases and statistics and erudite writing about the necessity for the equalization of rights and opportunities for men and women in our society. It would be strange indeed if the Congress of the United States which has legislated frequently and ardently for the equality of the sexes, should in the field of taxation find that a woman who desires to establish herself in the field of business, and her husband who obviously encouraged her, should be penalized because she is pursuing something which the Congress thinks is in the interest of our nation and its economy. Penalizing Taxpayers for Mrs. Jones' decision in no way furthers the clearly enunciated legislative purpose behind sections 913 and 911 of encouraging foreign employment of United States' citizens.

Although Jones' admittedly did not learn to speak Japanese and was relatively unassimilated into the Japanese culture, the majority of *Sochurek* factors support Jones' contention that he was a bona fide resident of Japan during the relevant period. Jones was not a mere transient or sojourner in Japan. Even though he intended to eventually return to his domicile in the United States after he retired from JAL, his purpose for being in Japan required him to remain there for at least eight years. Although Jones may have felt a little like a sojourner in a foreign land, as Moses did after he left Egypt and fled to Midian[4], under the applicable modern day tax statutes we are required to classify him as a bona fide resident of Japan, and not a mere transient or sojourner.

Sections 913 and 911 speak to the modern age; neither were quilled in antiquity.

Today, husbands and wives, men and women, have the right to separate careers. With respect to Jones' tax residence, he was neither a domiciliary nor a transient. He was a resident of Japan. The Code clearly could have used the word domicile or transient; neither of these are strange to our congressional enactments and legislation. Instead, the Code speaks in terms of residence. Since we find that Jones was a bona fide resident of Japan during the relevant time period, we reverse the tax court.

### Tax Home

Because the tax court determined that Jones was not a bona fide resident of Japan, it did not reach the question of whether Jones' tax home was in Japan. As we stated earlier, however, in order to qualify for the tax benefits available pursuant to sections 913 and 911, the taxpayer must prove both that he was a bona fide resident of a foreign country and that his tax home was in a foreign country. The term "tax home" was defined in Code Section 913(j)(1)(B) for Taxpayers' 1981 tax year and in Code Section 911(d)(3) for Taxpayers' 1982 and 1983 tax years. Both of these sections defined "tax home" as follows:

> The term "tax home" means, with respect to any individual, such individual's home for purposes of § 162(a)(2) (relating to traveling expenses while away from home). An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States.

*See also* 26 C.F.R. §§ 1.913–3(a) & 1.911–2(b)[5]. Treasury Regulation Section 1.911–

---

**4.** Exodus 2:22.

**5.** Tax home is further defined in section 1.911–2(b), which provides:

(b) Tax home ... an individual's tax home is considered to be located at his regular or principal (if more than one regular) place of business, or if the individual has no regular or principal place of business, then at his regular place of abode in a real and substantial sense. An individual shall not, however, be considered to have a tax home in a foreign country for any period for which the individual's abode is in the United States. Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States during that time. Maintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean the individual's abode is in the United States.

26 C.F.R. § 1.911–2(b).

2(b) sets forth the general rule that a taxpayer's tax home is at his principal place of business or employment. However, both sections 913 and 911, and the regulations promulgated pursuant to them, provide the overriding exception that if an individual's *abode* is in the United States, then he is legally incapable of establishing that his tax home is in a foreign country. *See Lemay v. Commissioner*, 837 F.2d 681, 683 (5th Cir.1988).

The term "abode" was not defined by the 1978 Foreign Earned Income Act which added the abode limitation. Pub.L. No. 95–615, 92 Stat. 3098 (1978). According to the Taxpayers, the only indication of legislative intent is found in a House Ways and Means Committee report:

[A] taxpayer is ineligible for the deduction for excess foreign living costs for any period for which his abode is in the United States. For example, a taxpayer who lives in Detroit, Michigan, but commutes daily to work in Windsor, Ontario, would ordinarily have his tax home in Windsor, but nevertheless would be ineligible for the deduction for excess foreign living costs.

H.R.Rep. No. 1463, 95th Cong., 2d Sess. 10 (1978); *see also* S.Rep. No. 746, 95th Cong.2d Sess. 7 (1978), U.S.Code Cong. & Admin.News 1978, p. 7612. This excerpt seems to indicate that the Congressional purpose in adding the abode limitation was to make these tax benefits available only to those individuals who actually incurred increased living expenses while living abroad. *See also* S.Rep. No. 746, 95th Cong., 2d Sess. 7 (1978), U.S.Code Cong. & Admin. News 1978, p. 7618 ("Equitable treatment of individuals working abroad requires that relief be more closely related to the actual increased expenses which the individual must incur while working abroad."); H.R. Rep. No. 1463, 95th Cong., 2d Sess. 7 (1978) ("The Committee believes that, because of the extraordinary costs of overseas living in many situations, special consideration must be given to Americans working abroad in order to treat them equitably for tax purposes.").

Recently the tax court has had an opportunity to discuss the abode limitation, and this court has affirmed at least two of these opinions. *See Lemay v. Commissioner*, 53 T.C.M. (CCH) 862 (1987), *aff'd*, 837 F.2d 681 (5th Cir.1988); *Bujol v. Commissioner*, 53 T.C.M. (CCH) 762 (1987), *aff'd without published opinion*, 842 F.2d 328 (5th Cir.1988). In these cases, this court has adopted the following definition of abode:

'Abode' has been variously defined as one's home, habitation, residence, domicile, or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of 'abode' depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, 'abode' has a domestic rather than a vocational meaning, and stands in contrast to 'tax home'....

*Lemay*, 837 F.2d at 683. In both *Lemay* and *Bujol*, this court denied the taxpayer the tax benefits found in sections 913 and 911, finding that their abode remained in the United States. Both of these cases involved taxpayers who worked in the oil industry and worked primarily on offshore oil rigs. In both instances, the taxpayer/employee commuted to and from the foreign jurisdiction for a brief and fixed period of time, typically twenty-eight days at work and twenty-eight days off. The taxpayer's family did not accompany them due to the living conditions. Further, the taxpayer's commuting and living expenses while abroad were paid for by the employers.

In denying benefits, this court analyzed the taxpayer's familial, economic and personal ties to the foreign workplace and compared these with the taxpayer's ties to his home in the United States. *Lemay*, 837 F.2d at 684; *Bujol*, 53 T.C.M. (CCH) at 764. This court, and the tax court below, focused on the regularity with which the taxpayer returned to his home in the United States and to the minimal contact the taxpayer had with the culture and society of the foreign country in which they worked. *Id.*

The facts in this case can easily be distinguished from oil rig and compound worker

cases, such as *Lemay* and *Bujol.* In those cases, when the taxpayers were on duty on oil rigs or in the oil field compounds, they slept in employer-provided housing, ate employer-provided meals and returned home to the United States after each work period on employer-provided flights. In addition, the taxpayer's family was not allowed to join him abroad. These taxpayers were not incurring any costs associated with living abroad; rather, they were essentially commuting on a regular basis from their homes in the United States.

In contrast, Jones had to pay for his vacation travel to the United States. Jones also paid for his meals and his housing while abroad. Jones also incurred the additional cost of paying Japanese income taxes. In addition, Mrs. Jones had the opportunity to move to Japan if she had so desired, but she elected to keep her job in Anchorage for her own personal reasons. Therefore, Jones' abode was in Japan and not in the United States, and his tax home was also in Japan during the relevant period.

## III. CONCLUSION

We are compelled to conclude that the tax court erred as a matter of law. Taxpayers have established that Jones was a bona-fide foreign resident of Japan and had his tax home in Japan during the years in question. Therefore, the tax court decision is REVERSED and REMANDED with direction to the tax court to expunge the deficiency assessed and enter judgment for the Taxpayers.