**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 00-60648**

_____

**COMPAQ COMPUTER CORPORATION AND SUBSIDIARIES,**

**Petitioner-Appellant,**

**versus**

**COMMISSIONER OF INTERNAL REVENUE,**

**Respondent-Appellee.**

_____

Appeal from a Decision
of the United States Tax Court
_____

December 28, 2001

Before JONES, SMITH, and DeMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In this case, Compaq Computer Corporation engaged in a foreign stock transaction involving the purchase and resale of American Depository Receipts (ADRs). The Tax Court held that because the ADR transaction lacked economic substance, the transaction should be disregarded for federal income tax purposes. 113 T.C. 214 (1999). The Eighth Circuit recently decided the same question and concluded as a matter of law that ADR transactions of the sort at issue here have economic substance and a business

purpose.  We agree with the Eighth Circuit's conclusion and reverse.

**BACKGROUND**

The facts are stated in the opinion of the Tax Court and are set out only briefly here.  An ADR is a trading unit, issued by a trust, that represents ownership of stock in a foreign corporation.  Foreign stocks are customarily traded on U.S. stock exchanges using ADRs.  An ADR transaction of the kind at issue in this case begins with the purchase of ADRs with the settlement date at a time when the purchaser is entitled to a declared dividend -- that is, before or on the record date of the dividend.  The transaction ends with the immediate resale of the same ADR with the settlement date at a time when the purchaser is no longer entitled to the declared dividend -- that is, after the record date.  In the terminology of the market, the ADR is purchased "cum dividend" and resold "ex dividend."

Twenty-First Securities Corporation, an investment firm specializing in arbitrage transactions, proposed to Compaq that Compaq engage in an ADR transaction.  Compaq's assistant treasurer, James Tempesta, and treasurer, John Foster, had a one-hour meeting with Twenty-First to discuss this possibility.  After a discussion among Tempesta, Foster, and Compaq's chief financial officer, Darryl White, it was decided to go forward with an ADR transaction. Tempesta did not perform a cash-flow analysis before agreeing to

2

the transaction. His investigation of the transaction and of Twenty-First was limited to telephoning a reference and reviewing a Twenty-First spreadsheet analyzing the transaction.

The securities chosen for the transaction were ADR shares of Royal Dutch Petroleum Company. Compaq knew little or nothing about Royal Dutch other than generally available market information. Without involving Compaq, Twenty-First chose both the sizes and prices of the trades and the identity of the company that would sell the ADRs to Compaq.

On September 16, 1992, Twenty-First, acting on Compaq's behalf, bought ten million Royal Dutch ADRs from the designated seller, which was another client of Twenty-First. Twenty-First immediately sold the ADRs back to the seller. The trades were made in 46 separate New York Stock Exchange (NYSE) floor transactions -- 23 purchase transactions and 23 corresponding resale transactions -- of about 450,000 ADRs each and were all completed in a little over an hour. Any trader on the floor was able to break up any of these transactions by taking part or all of the trade; but none, it appears, did. Because the trades were completed at market prices, no trader had an incentive to break up the transaction. The aggregate purchase price was about $887.6 million, cum dividend. The aggregate resale price was about $868.4 million, ex dividend. Commissions, margin account interest, and fees were about $1.5 million. Pursuant to special NYSE settlement terms, the purchase

trades were formally settled on September 17. Pursuant to regular NYSE terms, the resale trades were settled on September 21. Compaq used a margin account with Bear Stearns & Co., a well known securities brokerage firm. Compaq was the shareholder of record of the ADRs on the dividend record date and was therefore entitled to a gross dividend of about $22.5 million. About $3.4 million in Netherlands tax was withheld from Compaq's dividend by Royal Dutch and paid to the Netherlands government. The net dividend, about $19.2 million, was paid directly to Compaq.

On its 1992 U.S. income tax return, Compaq reported about $20.7 million in capital losses on the purchases and resales, about $22.5 million in gross dividend income, and a foreign tax credit of about $3.4 million for the Netherlands tax withheld from the gross dividend. Compaq used the capital loss to offset part of a capital gain of about $231.7 million that Compaq had realized in 1992 from the sale of stock in another company.

The Commissioner sent a notice of deficiency to Compaq for its federal income taxes that cited, among other things, the Royal Dutch transaction. Compaq filed a petition in the Tax Court for redetermination of the deficiencies and of an accuracy-related penalty for negligence asserted for 1992 under Internal Revenue Code (26 U.S.C.) § 6662. Concluding that the transaction should be disregarded for U.S. income tax purposes, the court upheld the deficiencies and the negligence penalty. The court disallowed the

4

gross dividend income, the foreign tax credit, and the capital losses reported by Compaq on its tax return. Compaq then argued that it should at least be allowed to deduct the out of pocket losses -- commissions, margin account interest, and fees -- that it had incurred in the course of the transaction, but the court held that the expenses could not be deducted. Compaq appealed.

**STANDARD OF REVIEW**

This court reviews the Tax Court's conclusions of law de novo and its factual findings for clear error. See <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 581 n.16, 98 S. Ct. 1291, 1302 n.16 (1978); <u>Chamberlain v. Comm'r</u>, 66 F.3d 729, 732 (5th Cir. 1995). The Tax Court's determinations of mixed questions of law and fact are subject to de novo review. See <u>Jones v. Comm'r</u>, 927 F.2d 849, 852 (5th Cir. 1991). In particular, "legal conclusion[s]" that transactions are shams in substance are reviewed de novo. <u>Killingsworth v. Comm'r</u>, 864 F.2d 1214, 1217 (5th Cir. 1989). See <u>Frank Lyon Co.</u>, 435 U.S. at 581 n.16, 98 S. Ct. at 1302 n.16 ("The general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject.").[1] This is

---

[1] Decisions such as <u>Freytag v. Comm'r</u>, 904 F.2d 1011, 1015-16 (5th Cir. 1990), <u>aff'd on other grounds</u>, 501 U.S. 868, 111 S. Ct. 2631 (1991), state that this court reviews findings that transactions are shams for clear error. In keeping with <u>Frank Lyon Co.</u>, we read such statements as referring only to genuine factual findings (e.g., a finding that a transaction was a "sham in fact," that is, that the transaction never occurred, see <u>Killingsworth</u>, 864 F.2d at 1216 & n.3; <u>James v. Comm'r</u>, 899 F.2d 905, 908 n.4 (10th Cir. 1990)), not to conclusions of law. See <u>Killingsworth</u>, 864 F.2d at 1217; <u>Sacks v. Comm'r</u>, 69 F.3d 982, 986

true even though the Tax Court has characterized some of its determinations as "ultimate findings of fact." 113 T.C. at 219. See Ratanesan v. Cal. Dep't of Human Servs., 11 F.3d 1467, 1469 (9th Cir. 1993).

## DISCUSSION

"[W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." Frank Lyon Co., 435 U.S. at 583-84, 98 S. Ct. at 1303-04. See Holladay v. Comm'r, 649 F.2d 1176, 1179 (5th Cir. Unit B Jul. 1981) ("[T]he existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations."), cited in Merryman v. Comm'r, 873 F.2d 879, 881 (5th Cir. 1989). The Government has stipulated that aside from its contention that the Royal Dutch transaction lacked economic substance, it has no objection to how Compaq chose to report its tax benefits and liabilities concerning the transaction.

_____

(9th Cir. 1995); James, 899 F.2d at 909 & n.5.

6

In Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89 (4th Cir. 1985), the court held that after Frank Lyon Co., it is appropriate for a court to engage in a two-part inquiry to determine whether a transaction has economic substance or is a sham that should not be recognized for income tax purposes. "To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." Id. at 91 (emphasis added). See id. ("[S]uch a test properly gives effect to the mandate of the Court in Frank Lyon that a transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance considerations.") (emphasis added). Other courts have said that business purpose and reasonable possibility of profit are merely factors to be considered in determining whether a transaction is a sham. See, e.g., ACM Partnership v. Comm'r, 157 F.3d 231, 247 (3d Cir. 1998) ("[T]hese distinct aspects of the economic sham inquiry do not constitute discrete prongs of a 'rigid two-step analysis,' but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.") (citation omitted); James v. Comm'r, 899 F.2d 905, 908-09 (10th Cir. 1990). Because we conclude that the ADR transaction in this case had both

7

economic substance and a business purpose, we do not need to decide today which of these views to adopt.

The Tax Court reasoned that Compaq's ADR transaction had neither economic substance nor a non-tax business purpose. The court first concluded that Compaq had no reasonable opportunity for profit apart from the income tax consequences of the transaction. The court reached this conclusion by employing a curious method of calculation: in computing what it called Compaq's net "cash flow" from the transaction, the court assessed neither the transaction's pre-tax profitability nor its post-tax profitability. Instead, the court assessed profitability by looking at the transaction after Netherlands tax had been imposed but before considering U.S. income tax consequences. The court subtracted Compaq's $20.7 million in capital losses, not from the $22.5 million gross dividend, but from the $19.2 million net dividend.[2] The court then ignored the $3.4 million U.S. foreign tax credit that Compaq claimed corresponding to the $3.4 million Netherlands tax. Put otherwise, in determining whether the ADR transaction was profitable, the court treated the Netherlands tax as a cost of the transaction, but did not treat the corresponding U.S. tax credit as a benefit of the transaction. The

---

[2] The Tax Court did this even though the Government had admitted that according to generally accepted accounting principles (to which the Government cited no exceptions), the entire amount of the gross dividend must be reported as income.

8

result of this half pre-tax, half after-tax calculation was a net loss figure of roughly $1.5 million.

The court rejected Compaq's argument that it had a profit prior to the assessment of tax.

> [Compaq] used tax reporting strategies to give the illusion of profit, while simultaneously claiming a tax credit in an amount (nearly $3.4 million) that far exceeds the U.S. tax (of $640,000) attributed to the alleged profit, and thus is available to offset tax on unrelated transactions. . . . By reporting the gross amount of the dividend, when only the net amount was received, petitioner created a fictional $1.9 million profit as a predicate for a $3.4 million tax credit.

113 T.C. at 222. The court said that the intention and effect of the transaction were to capture a tax credit, not substantive ownership of Royal Dutch ADRs, and that the transaction had been arranged so as to minimize the risks associated with it. See id. at 223-24.

As for Compaq's business purpose, the Tax Court concluded that Compaq was motivated only by the expected tax benefits of the ADR transaction. Among other things, the court said, Compaq had not engaged in a businesslike evaluation of the transaction. See id. at 224-25.

The Tax Court's decision is in conflict with IES Indus., Inc. v. United States, 253 F.3d 350 (8th Cir. 2001).[3] In IES, the

---

[3] The Tax Court's decision in this case has been subject to extensive commentary, friendly and not so friendly. See, e.g., Marc D. Teitelbaum, Compaq Computer and IES Industries -- The Empire Strikes Back, 20 Tax Notes Int'l 791 (2000) (disagreeing sharply with Tax Court); David P. Hariton, Sorting Out the Tangle of Economic Substance, 52 Tax Law. 235, 273 (1999) (". . . I am not sure

court held as a matter of law that an ADR transaction identical to this one was not a sham transaction for income tax purposes.[4] Undertaking the two-part inquiry set out in Rice's Toyota World, 752 F.2d at 91-92, the court declined to decide whether a transaction would be a sham if either economic substance or business purpose, but not both, was present. See IES, 253 F.3d at 353-54. Instead, the court concluded that both economic substance and business purpose were present in the transaction before it.

Turning first to economic substance, the court rejected the argument that the taxpayer purchased only the right to the net dividend, not the gross dividend. "[T]he economic benefit to IES was the amount of the gross dividend, before the foreign taxes were paid. IES was the legal owner of the ADRs on the record date. As such, it was legally entitled to retain the benefits of ownership,

Compaq is getting away with enough in this transaction for a court to disallow the results for lack of economic substance; to find otherwise might represent too great an incursion into our objective system for determining tax liabilities."); Peter C. Canellos, A Tax Practitioner's Perspective on Substance, Form and Business Purpose in Structuring Business Transactions and in Tax Shelters, 54 SMU L. Rev. 47, 54 (2001) ("Transactions involving . . . foreign tax-credits on dividend-stripping transactions exist in the hinterland between merely aggressive transactions and tax shelters, the border crossed as artificiality increases and tax benefits become more unreasonable.") (footnote omitted); George K. Yin, Getting Serious About Corporate Tax Shelters: Taking a Lesson From History, 54 SMU L. Rev. 209, 222 (2001) (answer to question whether Compaq transaction should be disallowed for tax purposes "may not be so easy after all"); David P. Hariton, Tax Benefits, Tax Administration, and Legislative Intent, 53 Tax Law. 579, 609 (2000) (Compaq was "rightly decided [by the Tax Court] perhaps, but without a clear analysis"); Daniel N. Shaviro, Economic Substance, Corporate Tax Shelters, and the Compaq Case, 88 Tax Notes 221 (2000) (generally endorsing Tax Court's approach); David A. Weisbach, The Failure of Disclosure as an Approach to Shelters, 54 SMU L. Rev. 73, 79 (2001) ("I think the[ Compaq] transaction[] w[as] clearly in the shelter camp.").

[4] The Commissioner concedes that the transaction at issue in IES is identical to that at issue in this case.

that is, the dividends due on the record date." Id. at 354. The court said that the part of the gross dividend withheld as taxes by the Dutch government was as much income to the taxpayer as the net dividend remaining after taxes. The court relied on the venerable principle, articulated in Old Colony Trust Co. v. Comm'r, 279 U.S. 716, 729, 49 S. Ct. 499, 504 (1929), that "[t]he discharge by a third person of an obligation to him is equivalent to receipt by the person taxed." In Old Colony Trust Co., the Supreme Court held that when an employer pays an employee's income taxes, the payment of the taxes constitutes income to the employee. Similarly, in Diedrich v. Comm'r, 457 U.S. 191, 199-200, 102 S. Ct. 2414, 2420 (1982), the Court held that when a donor of a gift of property conditions the gift on the donee's paying the gift tax owed by the donor on the gift, the donee's payment of the donor's gift tax obligation constituted income to the donor.

The IES court saw no reason why the Old Colony Trust Co. principle should not apply to the payment of foreign tax by withholding. "The foreign corporation's withholding and payment of the tax on IES's behalf is no different from an employer['s] withholding and paying to the government income taxes for an employee: the full amount before taxes are paid is considered income to the employee." IES, 253 F.3d at 354. When the full amount of the gross dividend was counted as income to the taxpayer, the transaction resulted in a profit to the taxpayer. See id.

11

As for business purpose, the court said that "[a] taxpayer's subjective intent to avoid taxes . . . will not by itself determine whether there was a business purpose to a transaction." Id. at 355. Compare Holladay, 649 F.2d at 1179. The court rejected the Government's argument that because the ADR transaction carried no risk of loss, it was a sham. The court noted that some risk, minimal though it may have been, attended the transaction. That the taxpayer had tried to reduce the risks did not make it a sham. "We are not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk. IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise of good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions." IES, 253 F.3d at 355.

The court further noted that the ADR transactions had not been conducted by alter egos or by straw entities created by the taxpayer simply for the purpose of facilitating the transactions. Instead, "[a]ll of the parties involved . . . were entities separate and apart from IES, doing legitimate business before IES started trading ADRs and (as far as we know) continuing such legitimate business after that time." Id. Each individual ADR trade was an arm's-length transaction. See id. at 356.

12

We agree with the IES court and conclude that the Tax Court erred as a matter of law by disregarding the gross amount of the Royal Dutch dividend and thus ignoring Compaq's pre-tax profit on the ADR transaction. We add the following comments.

First, as to economic substance: the Commissioner does not explain why the Old Colony Trust Co. principle does not apply here. That the tax was imposed by the Netherlands rather than by the United States, or that it was withheld rather than paid at the end of the tax year, is irrelevant to how the part of the dividend corresponding to the tax should be treated for U.S. income tax purposes. Pre-tax income is pre-tax income regardless of the timing or origin of the tax. See Old Colony Trust Co., 279 U.S. at 729, 49 S. Ct. at 504 ("It is . . . immaterial that the taxes were directly paid over to the government [by the taxpayer's employer, rather than by the taxpayer]."); Riggs Nat'l Corp. v. Comm'r, 163 F.3d 1363, 1365 (D.C. Cir. 1999) ("In calculating his United States tax liability, the lender must include in gross income the interest payment he receives from the borrower and the Brazilian tax paid (on his behalf) by the borrower to the Brazilian tax collector."); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 750 (1998) ("The indemnification agreement at issue results in taxable income to plaintiff because it contractually discharges plaintiff's

13

Egyptian tax obligation.").[5]  Because Compaq was entitled to payment of the dividend as of the record date, Compaq was liable for payment of tax on the dividend; accordingly, the payment of Compaq's Netherlands tax obligation by Royal Dutch was income to Compaq.  See 113 T.C. at 219 ($3.4 million payment to Netherlands "represent[ed] withholding amounts for dividends paid to U.S. residents" under treaty between U.S. and Netherlands); IES, 253 F.3d at 351-52, 354; Treas. Reg. § 1.901-2(f)(1) ("The person by whom tax is considered paid for purposes of [the foreign tax credit provisions of the Revenue Code] is the person on whom foreign law imposes legal liability for such tax, even if another person (e.g., a withholding agent) remits such tax."); Treas. Reg. § 1.901-2(f)(2)(i) ("Tax is considered paid by the taxpayer even if another party to a direct or indirect transaction with the taxpayer agrees, as a part of the transaction, to assume the taxpayer's foreign tax liability.").  Indeed, the Commissioner admitted in this case that according to generally accepted accounting principles, the entire amount of Compaq's gross dividend must be reported as income.  If the $3.4 million had been paid to the United States (whether by withholding or at the end of the tax year) instead of the Netherlands, there would have been no argument

_____

[5]     Indeed, the Internal Revenue Service has stated in a revenue ruling that "United States shareholders of foreign corporations should report, for Federal income tax purposes, the gross amount of dividends received from such corporations without reduction for withholding of the foreign income tax thereon."  Rev. Rul. 57-516, 1957-2 C.B. 435.

14

that this money was not income to Compaq.  It follows that the gross Royal Dutch dividend, not the dividend net of Netherlands tax, should have been used to compute Compaq's pre-tax profit.

The Tax Court also erred by failing to include Compaq's $3.4 million U.S. tax credit when it calculated Compaq's after-tax profit.  113 T.C. at 223.  This omission taints the court's conclusion that the "net economic loss" from the transaction after tax was about $1.5 million.  If the effects of tax law, domestic or foreign, are to be accounted for when they subtract from a transaction's net cash flow, tax law effects should be counted when they add to cash flow.  To be consistent, the analysis should either count all tax law effects or not count any of them.  To count them only when they subtract from cash flow is to stack the deck against finding the transaction profitable.[6]  During this litigation, the I.R.S. has consciously chosen to try to stack the deck this way.  See I.R.S. Notice 98-5, 1998-1 C.B. 334 ("In general, reasonably expected economic profit will be determined by taking into account foreign tax consequences (but not U.S. tax consequences) [of transactions]. . . .  In general, expected

---

[6]     The Tax Court's assertion that "[i]f we follow [Compaq]'s logic, . . . we would conclude that [Compaq] paid approximately $4 million in worldwide income taxes on . . . $1.9 million in profit" suffers from the same flaw.  113 T.C. at 222.  When Compaq's $3.4 million U.S. tax credit is counted in the calculation, Compaq's net worldwide tax liabilities arising from the transaction amount only to $644,000.  In addition, the assertion ignores the fact that only about $644,000 of the $4 million was paid on Compaq's $1.9 million pre-tax profit.  The rest of the $4 million was not paid on the profit; rather, the tax was paid (to the Netherlands) on the gross amount of the Royal Dutch dividend.

15

economic profit will be determined by taking into account expenses associated with an arrangement, without regard to whether such expenses are deductible in determining taxable income. For example, in determining economic profit, foreign taxes will be treated as an expense."). The Commissioner, however, has provided no reason to endorse its approach and ignore <u>Old Colony Trust Co.</u>[7] That the Government would get more money from taxpayers does not suffice.

To un-stack the deck and include the foreign tax credit in calculating Compaq's after-tax profit from the Royal Dutch transaction does not give Compaq a windfall. The purpose of the Revenue Code's foreign tax credit provisions is to reduce international double taxation. <u>See, e.g.</u>, <u>Norwest Corp. v. Comm'r</u>, 69 F.3d 1404, 1407 (8th Cir. 1995). Compaq reported its gross Royal Dutch dividend income to both the United States and the Netherlands. Without the tax credit, Compaq would be required to pay tax twice -- first to the Netherlands through withholding on the gross dividend, and then to the United States -- on the same dividend income. Taking the tax credit into account, Compaq owed roughly $644,000 more in worldwide income tax liability as a result of the transaction than it would have owed had the transaction not occurred. Although the United States lost $2.7 million in tax

---

[7] At oral argument, counsel for the Government admitted that he had found no case supporting the proposition that foreign tax on a transaction should be treated as an expense in determining whether the transaction was profitable.

16

revenues as a result of the transaction, that is only because the Netherlands gained $3.4 million in tax revenues.

If the effects of the transaction are computed consistently, Compaq made both a pre-tax profit and an after-tax profit from the ADR transaction. Subtracting Compaq's capital losses from the gross dividend rather than the net dividend results in a net pre-tax profit of about $1.894 million. Compaq's U.S. tax on that net pre-tax profit was roughly $644,000. Subtracting $644,000 from the $1.894 million results in an after-tax profit of about $1.25 million. The transaction had economic substance.

Second, as to business purpose: even assuming that Compaq sought primarily to get otherwise unavailable tax benefits in order to offset unrelated tax liabilities and unrelated capital gains, this need not invalidate the transaction. See Frank Lyon Co., 435 U.S. at 580, 98 S. Ct. at 1302 ("The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.") (footnote omitted); Holladay, 649 F.2d at 1179; ACM Partnership, 157 F.3d at 248 n.31 ("[W]here a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations."); Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir.

1934) (Hand, J. Learned) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."), aff'd, 293 U.S. 465, 55 S. Ct. 266 (1935).[8]  Yet the evidence in the record does not show that Compaq's choice to engage in the ADR transaction was solely motivated by the tax consequences of the transaction.  Instead, the evidence shows that Compaq actually and legitimately also sought

---

[8]     In particular, the fact that Compaq had a large unrelated capital gain in 1992 does not mean that Compaq had an impermissible motive in seeking to engage in the transaction.  The capital gain, of course, made it possible for Compaq to obtain an otherwise unavailable tax benefit from the ADR transaction by offsetting its $20.7 million in capital losses from the transaction against the gain.  26 U.S.C. § 1211(a) (corporation's "losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges"); Circle K Corp. v. United States, 23 Cl. Ct. 665, 670 (1991).  If Compaq had had no capital gain whatsoever in 1992, it would still have had to pay tax on the gross amount of its $22.5 million dividend from Royal Dutch, which -- in the absence of a capital gain against which to offset its capital losses -- would have resulted in a substantial after-tax loss to Compaq.  But cf. 26 U.S.C. § 1212 (allowing for certain carrybacks and carryovers of capital losses against capital gains realized in years different from the years in which the losses were realized); Circle K Corp., 23 Cl. Ct. at 670.  Put otherwise, the availability of a capital gain against which to offset the capital losses from the ADR transaction was a necessary precondition to the profitability of the transaction on an after-tax basis.  A sensible taxpayer would have engaged in such a transaction only if it had a capital gain against which to offset the capital losses that the taxpayer knew would result from the transaction.  All this is unremarkable and is no evidence that Compaq had an impermissible motive.

        According to the Commissioner, tax-exempt organizations with no use for U.S. income tax credits have an incentive to loan out their ADRs to non-tax-exempt persons in transactions of the kind at issue in this case.  The non-exempt persons can use the capital losses and tax credits resulting from ADR transactions to offset unrelated capital gains and tax liabilities.  The fact that the differing tax attributes of investors make ADRs more valuable for some investors than for others does not deprive ADR transactions of economic substance for purposes of the tax laws.  The possible benefits from ADR transactions for investors with unrelated capital gains and tax liabilities are analogous to the benefits that taxpaying investors (especially investors with high incomes), but not tax-exempt persons, get from the purchase of tax-exempt bonds with lower yields than the pre-tax yields available from non-exempt bonds.  See Yin, supra, at 222-23.  In both instances the benefits would not exist were it not for the investors' individual tax attributes.

18

the (pre-tax) $1.9 million profit it would get from the Royal Dutch dividend of approximately $22.5 million less the $20.7 million or so in capital losses that Compaq would incur from the sale of the ADRs ex dividend.

Although, as the Tax Court found, the parties attempted to minimize the risks incident to the transaction, those risks did exist and were not by any means insignificant. The transaction occurred on a public market, not in an environment controlled by Compaq or its agents. The market prices of the ADRs could have changed during the course of the transaction (they in fact did change, 113 T.C. at 218); any of the individual trades could have been broken up or, for that matter, could have been executed incorrectly; and the dividend might not have been paid or might have been paid in an amount different from that anticipated by Compaq. See IES, 253 F.3d at 355. The absence of risk that can legitimately be eliminated does not make a transaction a sham, see id.; but in this case risk was present. In light of what we have said about the nature of Compaq's profit, both pre-tax and post-tax, we conclude that the transaction had a sufficient business purpose independent of tax considerations.[9]

---

[9] In IES, the court noted the Tax Court's assertion in this case that in light of Compaq's limited investigation of the risks of the Royal Dutch transaction, Compaq had had no non-tax business purpose in agreeing to the transaction. 253 F.3d at 355. Even if we agreed with the Tax Court that Compaq had not adequately investigated the risks, it would not make a difference to the outcome of this case. Though Compaq could have done more to evaluate the risks of the transaction, the process it used does not alone prove a lack of business purpose for a transaction that had real risks. It should also be noted that in

19

Because the Royal Dutch ADR transaction had both economic substance and a non-tax business purpose, it should have been recognized as valid for U.S. income tax purposes.  This court's decisions applying the economic substance doctrine to disregard various transactions are not to the contrary.  Without enumerating all of the decisions, we mention some to give a flavor of the differences between the facts at issue in the decisions and in this case.  In Freytag v. Comm'r, 904 F.2d 1011 (5th Cir. 1990), aff'd on other grounds, 501 U.S. 868, 111 S. Ct. 2631 (1991), this court affirmed a Tax Court decision disallowing losses allegedly incurred as a result of investments in a commodity straddle program.  The taxpayers' investment agent had "absolute authority over the pricing and timing of the transactions" at issue, which "occurred in [a] self-contained market of its own making."  904 F.2d at 1016.[10]  In Merryman, a business partnership was disregarded for tax purposes because "the formation and role of the partnership served no other purpose except tax avoidance;" a number of facts found by the Tax Court indicated that the partnership lacked economic

---

this case, as in IES, the taxpayer declined to go forward with all of the transactions that Twenty-First had proposed.  See 113 T.C. at 216; IES, 253 F.3d at 355.

[10]    Similarly, in Fender v. United States, 577 F.2d 934, 937 (5th Cir. 1978), the taxpayers' sale-and-repurchase transactions involving bonds were not recognized where the taxpayers had "sufficient influence" over the other party to the transaction to "remove any substantial risk" that they would be unable to recapture their apparent losses from the sale of the bonds by repurchasing the bonds.  And in Salley v. Comm'r, 464 F.2d 479 (5th Cir. 1972), this court held that interest payments made by the taxpayers on loans from an insurance company that they controlled were not deductible.  See id. at 480.

reality and was a mere formality. See id. at 881-83. In Killingsworth, this court affirmed a Tax Court decision concluding that a scheme of option hedge or option straddle transactions lacked economic substance. We relied on Revenue Code section 108, a provision that is not relevant to this case, and noted that the transactions "appear[ed] to be devoid of profit making potential." 864 F.2d at 1218. In Holladay, this court affirmed the Tax Court's decision to disallow half of certain tax benefits that an agreement between two joint venturers allocated to only one of the venturers. The allocation had no valid non-tax business purpose. 649 F.2d at 1180. Compare Boynton v. Comm'r, 649 F.2d 1168, 1173-74 (5th Cir. Unit B Jul. 1981).

In this case, by contrast, the ADR transaction had both a reasonable possibility of profit attended by a real risk of loss and an adequate non-tax business purpose. The transaction was not a mere formality or artifice but occurred in a real market subject to real risks. And, as has been discussed, the transaction gave rise to a real profit whether one looks at the transaction prior to the imposition of tax or afterwards.

For the foregoing reasons, the Tax Court erred as a matter of law in disallowing Compaq's identification of gross dividend income, a foreign tax credit, and capital losses associated with the Royal Dutch ADR arbitrage transaction. It is unnecessary to reach the alternative arguments for reversal offered

21

by Compaq: first, that the statutory foreign tax credit regime implicitly displaces the economic substance doctrine; and second, that a 1997 amendment to the foreign tax credit scheme, which added what is now Internal Revenue Code § 901(k), implies that ADR transactions that took place before the amendment are to be recognized for tax purposes.  Because we reverse the Tax Court's decision concerning the underlying transaction, it follows that the court erred in imposing the negligence penalty and that the court's holding that Compaq was not entitled to deduct its out of pocket losses becomes superfluous.

The decision of the Tax Court is **REVERSED**.