United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 16, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

for the Fifth Circuit

No. 02-60188

BLUE CROSS AND BLUE SHIELD OF TEXAS, INC. AND SUBSIDIARIES,

Petitioner-Appellant,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeal from the Decision of the United States Tax Court

Before DeMOSS and STEWART, Circuit Judges, and FALLON,[1] District Judge.

FALLON, District Judge:

Before the Court is the appeal of the Tax Court's decision against appellant Blue Cross and Blue Shield of Texas, Inc. and Subsidiaries. The issues in this appeal require resolution of whether certain amounts referred to as "coordination of benefits savings" ("COB savings") qualify as "estimated salvage recoverable" such that Blue Cross can claim a special tax deduction, and, if not, whether Blue Cross met requirements to fall under a safe harbor provision entitling it to the

---

[1] District Judge for the Eastern District of Louisiana, sitting by designation.

deduction. The special deduction at issue allowed insurance companies to deduct ratably over a four year period 87% of estimated salvage recoverable as calculated at the end of tax year 1989. Blue Cross claimed the deduction for years 1992 and 1993 based on an amount of "salvage recoverable" that consisted mostly of COB savings and, the IRS subsequently denied the deduction after an audit. Blue Cross challenged the IRS' position denying the deduction. The Tax Court held that both Medicare related and non-Medicare related COB savings amounts did not qualify as estimated salvage recoverable so as to be the basis for a special deduction. Additionally, the Tax Court held that Blue Cross did not meet the requirements to fall under the safe harbor provision. For the reasons set forth below, we AFIIRM the decision of the Tax Court.

## BACKGROUND

From 1989 through 1993, Blue Cross and Blue Shield of Texas, Inc. (hereinafter "Blue Cross") was a Texas corporation engaged in the business of providing health insurance and related administrative services to individuals and groups. With regard to the group insurance contracts issued to employers, in some cases, Blue Cross assumed accident and health insurance risks of employees and their dependents and, in other cases, Blue Cross only provided administrative services with no assumption of accident and health insurance risks. In addition, from 1989 through 1993, Blue Cross was a party to contracts with the federal Health Care Finance Administration (hereinafter "HCFA") to provide administrative services for the processing of Medicare claims.

Blue Cross accident and health insurance policies included coordination of benefits ("COB") provisions, which are based on COB guideline regulations published by the National

Association of Insurance Commissioners. COB provisions apply where a person has duplicative coverage, i.e., where the person is covered by two or more plans providing health care benefits or services. COB provisions set forth mechanical rules for determining whether a health plan is the primary plan or secondary plan with respect to each particular claim submitted under the plan. A primary plan is defined as a plan whose benefits for participant's health care coverage must be determined without consideration of the existence of any other plan. A secondary plan is defined as one which is not a primary plan. During the years 1989 through 1993, Blue Cross operated a COB department whose purpose was to review claims subject to coordination of benefits and to determine whether Blue Cross was the primary plan or secondary plan with respect to each claim.

Under COB provisions, when there is overlapping coverage and a determination is made that one plan is primary and the other secondary, the secondary insurer has two options as to how to proceed on paying the claim. First, the secondary insurer can follow the "pay and pursue" approach, under which the secondary insurer would pay up front the full amount of the pending claim and then seek reimbursement from the primary insurer of the amount for which the primary insurer is responsible. The other choice for the secondary insurer is to follow the "pursue and pay" or "wait and pay" approach, under which the secondary insurer may wait for the primary insurer to calculate and to make their payment on a pending claim before making the secondary payment. Prior to and through the years in issue, Blue Cross routinely used the pursue and pay approach, not making a secondary claim payment until it had determined the amount of the primary payment and that the primary payment had been made by the primary plan. When Blue Cross made a claim payment as the secondary health plan under a COB provision on Medicare related claims, Blue Cross almost always knew that the primary portion had been paid by

3

Medicare. Whether an insurance company used the pursue and pay approach or the pay and pursue approach becomes important for the calculation of "unpaid losses" and the amount of financial reserves the company is required to maintain, which will be explained below.

When Blue Cross made a payment as the secondary health plan under a COB provision, it calculated an amount called COB savings, which consisted of the difference between the amount that Blue Cross would have paid if there had been no other plan in effect covering the person, and the amount, if any, Blue Cross paid as the secondary plan. In other words, these COB savings were amounts Blue Cross did not have to pay as a result of the COB provisions since such amounts were paid by another health plan. COB savings could also be Medicare related, such as when retired employees and their spouses are over the age of 65 and are covered under insurance plans issued by health insurance companies and are also covered under Medicare. Medicare related COB savings consist of the amount the health insurance company would be liable to pay for medical expenses if there were no Medicare coverage less the amount the companies are actually liable for and pay after taking into account payments to be made by Medicare. For 1989, Blue Cross calculated a total of $243,646,504 in COB savings. Approximately 85% of the $243,646,504 reflects Medicare related COB savings. For each of the taxable years 1989 through 1993, Blue Cross did not maintain a reserve for amounts recorded as "COB savings." The COB savings information was used by Blue Cross' marketing department.

Blue Cross included COB savings amounts, Medicare related and non-Medicare related, in its calculation of "unpaid losses" on its tax returns for purposes of the special deduction, by

4

treating the COB savings as "estimated salvage recoverable.[2]" "Unpaid losses" generally reflect actuarially estimated amounts of medical expenses that are incurred during the year, but, that by year end, are not paid by the health insurance companies. "Paid losses" reflect amounts of medical expenses that are incurred during the year that health insurance companies actually pay on claims. A health insurance loss is incurred at the time the insured received medical treatment. An interval of time elapses before this incurred but unpaid loss is reported to the insurance company and ultimately becomes a paid loss.

Unpaid losses are shown as a liability on Blue Cross' annual statement filed with the state insurance regulator *and* are included in Blue Cross' computation of "losses incurred" for federal income tax purposes. On annual statements filed with the state insurance regulator, insurance companies are required to report unpaid losses representing companies' estimate of all insured losses that have occurred on/before December 31 but which have not been paid as of that date. Insurance companies such as Blue Cross are required by law to maintain financial reserves for "unpaid losses" reported in their annual financial statement. If an insurance company uses the pay and pursue method for COB savings, then the amount of reserves required for unpaid losses is calculated based on the full, total amount of coverage on their plans, including amounts that they will pay and be reimbursed by other insurance companies. On the other hand, if the

---

[2] The potential problem with doing this, and where the issue is created, is that Blue Cross used the pursue and pay method for claims that fell under COB provisions; therefore, Blue Cross was taking into account amounts that other insurance companies were expected to pay as primary insurer in calculating Blue Cross' unpaid losses. As will be discussed below, the Tax Court viewed this as impermissible, because Blue Cross was claiming a salvage right to amounts that it never expected to have to pay. The term "estimated salvage recoverable" is not defined in the statute. Black's dictionary defines salvage in insurance as "the property saved or remaining after a fire or other loss, sometimes retained by an insurance company that has compensated the owner for the loss." Black's Law Dictionary, Seventh Edition (1999).

insurance company uses the pursue and pay approach for COB savings, then the amount of reserves required for unpaid losses is calculated based on the portion of the claim they were obligated to pay after the primary plan made its payment.  Therefore, the companies that use the pay and pursue approach for COB savings theoretically maintain  reserves in greater amounts than the companies that use the pursue and pay approach.

As stated earlier,  Blue Cross used the pursue and pay approach and only COB savings that resulted in actual payment or recovery by Blue Cross were used in the calculation of setting reserves.  The actuarial division of Blue Cross did not add the COB savings amounts to compute its "unpaid losses" reported in its annual statement and had no regular use for COB savings reports.   On its annual statement for 1989, Blue Cross reported unpaid losses of $180,021,858.

In addition to being reported on annual statements and for purposes of determining reserves, unpaid losses is an amount used to calculate "losses incurred" for federal income tax purposes.  "Losses incurred" is a deduction allowed by Section 832(c)(4) of the Internal Revenue Code. The Code defines "losses incurred" as losses paid during the taxable year plus the increase in unpaid losses during the year, subject to certain adjustments.  Prior to 1990, the section contained an adjustment for salvage recoverable, which required an insurance company for federal tax purposes to reduce its deduction for "paid losses" by an estimate of anticipated recoveries from salvage and subrogation not yet reduced to cash or cash equivalent.  As to "unpaid losses," insurance companies had the option to take into account estimated recoveries from third party tortfeasors and other health insurance companies.  If the company elected not to reduce the calculation of unpaid losses by estimated recoveries, the calculation was referred to as calculations of "unpaid losses *gross* of estimated recoveries;" on the other hand, if the company elected to

6

reduce the calculation of unpaid losses by estimated recoveries, the calculation was referred to as "unpaid losses *net* of estimated recoveries."

In 1990, the section was amended to require all health insurance companies to reduce their paid *and* unpaid losses included in "losses incurred" by estimated recoveries of salvage–in other words, to calculate unpaid losses net of estimated recoveries.[3] For those insurance companies that had not reduced their unpaid losses by estimated recovery of salvage in the years prior to 1990, the amendment constituted a change in the method of accounting that required reporting of additional income. Because of this effect, Congress granted a one time special deduction, forgiving 87% of this income and requiring the remaining 13% to be included in income ratably over four years. For companies that prior to 1990 had reported unpaid losses net of estimated recoveries, Congress granted a similar special deduction equaling 87% of the amount of "estimated salvage recoverable" that the companies had taken into account during 1989, to be deducted ratably over four years beginning with 1990.

In light of the change in the tax law, the Treasury Department issued official guidance on implementing the new tax law, and also provided a safe harbor provision. Under the implementing regulation, a tax payer claiming the special deduction was required to "establish to the satisfaction of the district director that the deduction represents only the discounted amount of non-admitted salvage recoverable that was actually taken into account by the taxpayer in computing losses incurred for" the last taxable year beginning January 1, 1990. Under the regulations, a taxpayer would be deemed to have taken salvage recoverable into account only if

---

[3] The amendment can be found in §11305(a) of the Omnibus Budget Reconciliation Act of 1990 (1990 OBRA), Pub. L. No. 101-508, 104 Stat. 1388-452.

7

the taxpayer filed a statement by September 16, 1991 with the insurance regulatory authority of the taxpayer's state of domicile disclosing the extent to which losses incurred for each line of business reported on the 1989 annual statement were reduced by estimated salvage recoverable. Moreover, in a proposed form of the regulation, a safe harbor provision was included which provided that if the requirements were followed, a deduction would not be adjusted in the absence of fraud. However, when the regulation was finalized, the "absence of fraud" language was changed to provide that amounts reported as "bona fide" estimated salvage recoverable would not be adjusted, if all other requirements were met.

Blue Cross, prior to 1990, calculated unpaid losses using the net calculation, that is, they reduced their unpaid losses by estimated recoveries and, therefore, they claimed the special deduction for tax years 1990 through 1993. Blue Cross calculated that under the special deduction rule, a total of $70,950,582 reflected Blue Cross' estimated salvage recoverable relating to unpaid losses for its last taxable year beginning before January 1, 1990. Blue Cross multiplied the total $70,950,582 by 87% and by a discount factor of approximately four percent, to produce a figure of $59,352,862, or $14,838,215, for each of the years 1990 through 1993 as its special deduction.

In September of 1991, Blue Cross sent a disclosure letter to the Texas Department of Insurance, which stated the following:

> As you are aware, in reporting to your department [Blue Cross] has always followed actuarially accepted and certified practices for determining and reporting its losses incurred and its incurred unpaid claim reserves. In OBRA 1990, Congress granted a special one time deduction to insurance carriers who report losses incurred as we do. IRS regulations provide that a notification filed with your office will establish the amount of this allowable tax deduction.

8

The sole purpose of this letter is to notify you that we have determined our special tax deduction to be 87% of $74,780,518 discounted at 96.1538% for recoveries related to our losses incurred deduction prior to 1990 and reported in the 1989 annual statement.

*OUR REPORTING TO YOU HAS NOT CHANGED AND WILL NOT CHANGE IN ANY RESPECT FROM THE ACCEPTED METHODS AND APPROACHES WE HAVE ALWAYS USED.* Our incurred unpaid claim reserves will continue to be determined using the same methods, include the same actuarial certifications as always and continue to be in full compliance with established methods and practices approved and routinely examined by your department.

On audit for tax years 1992 and 1993, the Commissioner of Internal Revenue disallowed each of Blue Cross' claimed $14,838,215 special deductions. Approximately 94% of the total $70,950,582 claimed by Blue Cross as estimated salvage recoverable reflected COB savings. Approximately 85% of the COB savings amount reflected Medicare related COB savings. Only approximately 3% of the $70,950,582 claimed by Blue Cross as estimated salvage recoverable reflected amounts that Blue Cross actually paid and then recovered from tortfeasors and from other insurance companies.[4] Blue Cross challenged the Commissioner's denial of the deduction in the United States Tax Court. The Tax Court held that Blue Cross' COB savings, both those that were Medicare related and non-Medicare related, did not constitute estimated salvage recoverable for purposes of the special deduction. Additionally, the Tax Court held that Blue Cross did not qualify for safe harbor relief because its disclosure letter did not meet the regulatory requirements. Blue Cross timely appealed to this Court the Tax Court's holdings regarding whether the COB

---

[4] Six percent of the total deduction is no longer at issue. The Tax Court approved 3% of the $70,950,582 that Blue Cross calculated as its total estimated salvage recoverable reflected amounts Blue Cross actually paid and then recovered from third party tortfeasors and other health insurance companies. The Tax Court found that Blue Cross also conceded that 3% of the amount claimed did not represent genuine salvage recoverable. The remaining amount in dispute is the 94% of the total estimated salvage recoverable, which represents COB savings.

9

savings constitute salvage recoverable and whether Blue Cross qualified for safe harbor relief.

## DISCUSSION

A. Standard of Review:

The standard of review in this case is de novo for conclusions of law and clear error for factual findings. *Compaq Computer Corp. & Subsidiaries v. Comm'r. of Internal Revenue*, 277 F.3d 778, 780 (5th Cir. 2001).

B. Did the Tax Court err in holding that Blue Cross could not treat amounts described as COB savings that it did not expect to pay as "estimated salvage recoverable" for purposes of the special deduction provided in 1990 OBRA, including amounts related to Medicare COB savings?

According to the Tax Court, the authority it reviewed suggested that to qualify as estimated salvage recoverable for purposes of the special deduction rule, there must exist an expectation of actual payment. Because Blue Cross used the pursue and pay approach before making secondary payments under COB provisions, the Tax Court held that Blue Cross' COB savings did not qualify as estimated salvage recoverable and were not allowable under the special deduction rule. Blue Cross did not expect to pay amounts reflected as COB savings under the pursue and pay approach; rather, they only expected to pay the portion they were obligated to pay as a secondary plan. On the other hand, the Tax Court reasoned that when an insurer uses the pay and pursue approach, there exists expectation of actual payment of amounts that may later be COB savings because they are properly payable by another plan, in which case the COB savings would qualify as estimated salvage recoverable.

As to medicare related COB savings, the Tax Court held that these savings also did not qualify as salvage recoverable for purposes of the special deduction because of an exclusion in

10

Blue Cross' policies, which it interpreted as excluding coverage for medical expenses and claims that were covered "under the Workers' Compensation law, or any other present or future laws enacted by the Legislature of any state, or by the Congress of the United States [such as Medicare]." Considering this provision, the Tax Court concluded that Medicare related benefits were excluded from coverage under Blue Cross' health insurance plans, and, therefore, without contractual liability and without payment of Medicare covered benefits, Blue Cross' Medicare related COB savings did not constitute estimated salvage recoverable.

Blue Cross argues that the Tax Court erroneously defined "estimated salvage recoverable" to require an expectation of actual payment. According to Blue Cross, both Medicare and non-Medicare related COB savings constitute estimated salvage recoverable because Blue Cross was liable for the full amount of incurred claims and, therefore, had a right of salvage for amounts that would be covered by primary insurers, despite the fact that they used the pursue and pay approach to the COB savings. Blue Cross maintains that from the time a person insured by Blue Cross incurred medical expenses, until such time as the primary health plan paid in whole or in part, Blue Cross remained liable to the insured for the full amount of covered expenses even though Blue Cross was "secondary" for COB purposes.[5]

_____

[5] As support for this concept of dual liability, Blue Cross points to the fact that the Texas Department of Insurance allowed health insurers to report its unpaid losses in the full amount, "gross" of COB recoverable. Blue Cross also relies on a Texas state law, the Life, Accident, Health & Hospital Service Insurance Guaranty Association Act, which provides that where an insolvent primary health insurer had a contractual obligation that was also the contractual obligation of a solvent secondary health insurer, no guaranty association benefits would be provided until the insured first exhausted his rights against the solvent secondary health insurer. According to Blue Cross, the law presumed the existence of a duplicative contractual obligation to the insured on the part of both health insurers until such time as the liability was extinguished by payment of one or the other. Last, Blue Cross refers to Texas and Louisiana state court cases that it asserts have recognized that both health plans remain primarily liable to the insured even

11

With regard to Medicare related COB savings, Blue Cross argues that it was liable for such claims under the "other coverage" provision of its insurance contracts. According to Blue Cross, "other coverage" includes "any governmental program existing by statutory authority" under which the insured is entitled to medical benefits, except Medicaid. Blue Cross policies provided that when Blue Cross was the secondary carrier to the insured's "other coverage" "the benefits of the other coverage shall be deducted from the [medical expenses] for which any benefit is provided under [this contract] . . . and [Blue Cross] will pay the remainder of the charges for such items." Under these provisions, Blue Cross claims it coordinated benefits with Medicare as it would with any other health plan, and Blue Cross' liability to an insured retiree would only be extinguished to the extent Medicare actually paid benefits. Blue Cross would be obligated to pay the remainder of the covered expenses.

Blue Cross argues that the Tax Court's reliance on an exclusionary provision in the policies is misplaced. The exclusionary provision the Tax Court relied on excluded coverage for "any [medical] services or supplies for which benefits are, or could upon proper claim be, provided under the Workers' Compensation law, or any other present or future laws enacted by the Legislature of any state, or by the Congress of the United States. . . ." Blue Cross argues that if the Tax Court's extreme interpretation of this provision as excluding all liability of Blue Cross for Medicare covered claims is accepted, the effect would be that Blue Cross was charging millions of dollars per year to insureds who were also covered under Medicare in return for no

though COB rules make those health plans primary or secondary with respect to each other. (citing *Caraway v. Royale Airlines, Inc.*, 559 So. 2d 954 (La. Ct. App. 2d Cir. 1990) *rev'd in part on other grounds,* 579 So. 2d 424 (La. 1991) and *Texas Prop. & Cas. Ins. Guar. Assoc. v. Southwest Aggregates, Inc.*, 982 S.W.2d 600, 606 (Tex. Ct. App. 1998)).

12

coverage, and all payments that Blue Cross had previously made on Medicare related claims were just out of its kindness and generosity because Blue Cross was not obligated to pay anything. Aside from the nonsensical implications resulting from such an interpretation of the exclusion, Blue Cross argues that even if the provisions concerning "other coverage" and this exclusion were viewed as ambiguous, Texas state law would apply and construe the contract in favor of coverage for these Medicare related claims.[6]

Furthermore, Blue Cross asserts that the term "salvage" means tangible and intangible property, including tort subrogation and rights against any third party who may be liable for the insured's loss. To support its argument that pursue and pay COB savings qualify as salvage recoverable, Blue Cross reasons that there are two ways for the insurer to have the benefit of the insured's claim against a third party: the third party can either pay the insurer or pay the insured. In the former case, the insurer takes over and pursues the insured's claim against the third party; in the latter case, the insurer lets the insured keep the claim against the third party. It is Blue Cross' position that either way, the benefit to the insurer is the same and falls within the concept of salvage for tax purposes. In support of this theory, Blue Cross cites the appellee's expert witness, Professor Brockett, who testified that property is salvage whether or not the insurer takes possession of tangible property. Blue Cross argues that this concept should also apply to intangible property in the form of a claim for money.

In opposition to Blue Cross' arguments, Appellee asserts that the COB savings do not constitute estimated salvage recoverable because they were not reasonable estimates of recovery

---

[6] In its reply brief, as an additional basis for its argument that the Tax Court erroneously relied on the exclusion, Blue Cross argues that the exclusion excluded coverage only for workplace injuries.

on amounts that Blue Cross anticipated it would have to pay. Rather, according to Blue Cross' financial reporting director, the COB savings were amounts that they expected the other insurance company to pay. Additionally, Blue Cross' actuary stated that he established the company's loss reserve net of COB savings because there was no anticipated liability of the company for those payments by other companies. Specifically with regard to Medicare related COB savings, Appellee argues that Blue Cross always knew the amount that Medicare had paid before it calculated COB savings and, therefore, had no expectation that it would have to pay amounts Medicare already paid.

In addition, Appellee asserts that the Tax Court's interpretation of salvage recoverable is correct because it is consistent with industry usage. In particular, Professor Brockett testified that the general insurance industry would not view COB savings as salvage and subrogation because the key to recovery, salvage, and subrogation is payment. According to Appellee, even Blue Cross' expert agreed that gross reserves are based on an estimation of the amount that a company expects to pay out and that a secondary insurer would not have a recovery for COB savings because it would not be paying those amounts.

As the Tax Court noted, limited authority exists to explain estimated salvage recoverable. The term "estimated salvage recoverable" is not defined in the Tax Code. The term appears in section 832 of the Internal Revenue Code, 26 U.S.C. § 832(5)(a), which outlines the procedure to calculate "losses incurred," a deduction for federal income tax purposes. In explaining how to calculate "losses incurred," the Code provides the following:

> The term "losses incurred" means losses incurred during the taxable year on insurance contracts computed as follows (i) To losses paid during the taxable year, deduct salvage and reinsurance recovered

14

during the taxable year. (ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses . . . outstanding at the end of the taxable year and deduct all unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year. (iii) To the results so obtained, add estimated salvage recoverable and reinsurance recoverable as of the end of the preceding taxable year and deduct estimated salvage recoverable and reinsurance recoverable as of the end of the taxable year.

Under this statute, estimated salvage recoverable is one component used in the calculation to determine the appropriate amount of the deduction for losses incurred. Prior to 1990, Section 832 required only *paid losses* to be reduced by salvage recoverable. However, in 1990 Congress amended section 832 by §11305(a) of the Omnibus Budget Reconciliation Act of 1990 ("1990 OBRA")[7], now requiring that both *paid and unpaid* losses be reduced by estimated salvage recoverable, whether or not the salvage is treated as an asset for statutory accounting purposes. In other words, prior to 1990, salvage recoverable was only used to calculate paid losses for the "losses incurred" determination; after 1990, salvage recoverable is used to calculate paid and unpaid losses for the "losses incurred" determination. Because "estimated salvage recoverable" is a subpart of paid and unpaid losses, definitions and interpretations of paid and unpaid losses are instructive on the scope of "estimated salvage recoverable," as well as explanations of the concept of salvage in general. In fact, such definitions and interpretations are the only sources for determining what "estimated salvage recoverable" means, and whether it should include COB savings under a pursue and pay approach.

"Salvage" in the insurance context is "the property saved or remaining after a fire or other loss, sometimes retained by an insurance company that *has compensated* the owner for the loss."

---

[7] Pub. L. No. 101-508, 104 Stat. 1388-452.

15

Black's Law Dictionary, Seventh Edition (1999). (Emphasis added). The United States Supreme Court described the general concept of salvage in the following way: "From the very nature of the contract of insurance as a contract of indemnity, the insurer, *when he has paid to the assured* the amount of indemnity agreed on between them, is entitled by way of salvage, to the benefit of anything that may be received, either from the remnants of the goods, or from damages paid by third persons for the same loss." *Phoenix Ins. Co. v. Erie & Western Transp. Co.*, 117 U.S. 312, 321 (1886). (Emphasis added).[8]

Specifically in the context of *paid* losses, courts have considered the terms salvage and salvage recoverable in cases decided prior to the 1990 amendment. One court explained that "when an insurance company pays a claim, it ordinarily has a right of salvage under the insurance policy." *Allstate Fire Ins. Co. v. United States*, No. 381-73, 1980 WL 4713, *7 (Ct. Cl. Mar. 14, 1980). Another case pointed out that "salvage includes all tangible property and subrogation claims acquired by an insurance company after indemnifying its insured under contracts of insurance." *Continental Ins. Co. v. United States*, 474 F.2d 661, 664 (Ct. Cl. 1973). In *Continental*, the Court explained that in calculating paid losses, salvage in the course of liquidation, consisting of all property, real or personal, and tangible or intangible, shall be taken into account to the extent of the value thereof at the end of the taxable year as determine from a fair and reasonable estimate based upon either the facts of each case or the company's experience

---

[8] See also *Van Schaick v. Comm'r. of Internal Revenue*, 32 B.T.A. 736, 741 (U.S. Bd. Tax App. 1935) (agreeing that term salvage as used in the law of insurance is the proceeds received by the insurer (1) after paying total loss or amount of valuation in a valued policy, out of the property, the subject matter of the insurance contract; or (2) after paying total or partial loss, out of the claim that passes to the insurer by virtue of the right of subrogation and not as an incident to the property in the subject matter of the insurance contract .)

16

with similar cases. *Id.* at 666-67. These cases suggest that salvage recoverable, at least in the context of paid losses, includes amounts the company reasonably expects that it will recover after it has paid a claim.

In the context of unpaid losses, courts have not considered the meaning or scope of "estimated salvage recoverable." However, Income Tax Regulation 1.832-4 directly addresses the calculation of "unpaid losses" for the purpose of determining losses incurred, and estimated salvage recoverable is a part of that calculation. Regulation 1.832-4 provides the following:

> In computing "losses incurred" the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them. Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred"which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses . . . . These losses must be stated in amounts which, based upon the facts in each case and the company's experience with similar cases, represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of unpaid losses which, in the opinion of the district director, are in excess of a fair and reasonable estimate will be disallowed as a deduction . . . . Estimates of salvage recoverable must be based on the facts of each case and the company's experience with similar cases.

Although this regulation does not expressly define salvage recoverable, salvage recoverable is a subpart used to determine unpaid losses and, therefore, the scope of the term salvage recoverable must be interpreted in accordance with the rules applicable to unpaid losses. The Tax Court considered the above detailed sources to determine what constitutes estimated salvage recoverable. Such limited authority is all that is available to determine the meaning of the term.

Blue Cross criticizes the Tax Court's emphasis on the phrase "will be required to pay" in the regulation regarding losses incurred and argues that the phrase was erroneously relied on as

17

the basis for the Tax Court's holding that COB savings under the pursue and pay approach do not constitute estimated salvage recoverable. According to Blue Cross, a Technical Advice Memorandum issued by the IRS eight months after the Tax Court's decision clarifies that the phrase "will be required to pay" refers to the requirement that taxpayers base their estimates of unpaid losses on actual losses, not losses that might occur in the future. On the other hand, the Appellee points to another Technical Advice Memorandum that it contends supports its position and addresses the issue directly, providing that treasury regulations prohibit setting up unpaid losses on pursue and pay savings. However, according to the Internal Revenue Code, 26 U.S.C. § 6110, such technical advice memorandum may not be used or cited as precedent.

Despite Blue Cross' arguments, under the limited authority available regarding the meaning and scope of the term, the Tax Court correctly held that COB savings under the pursue and pay approach do not constitute estimated salvage recoverable. Applying the rule regarding unpaid losses to determine the scope of estimated salvage recoverable leads to the conclusion that estimated salvage recoverable must consist of amounts the company expects to recover from amounts that it will pay or has paid, based on the company's experience and the facts of the case.[9] If the company uses the pursue and pay approach for COB savings, then the company does not expect to actually pay the portion of the claim covered by the primary plan. Based on its experience and the facts of the case, the insurer cannot include that amount as unpaid losses

_____

[9] As one author explained, "estimated salvage recoverable includes all *anticipated* recoveries on account of salvage . . ." citing Treasury Regulation 1.832-4 discussing the losses incurred calculation. MARTIN WEINSTEIN, ET AL., MERTEN'S LAW OF FED. INCOME TAXATION §44:11(2003) (Emphasis added). Blue Cross cannot anticipate a recovery when it only anticipates paying the portion of the claim it is responsible for as secondary insurer. However, if Blue Cross used the pay and pursue approach, Blue Cross would anticipate recovery on claims it paid in full when it was only responsible as a secondary insurer.

18

because its experience and expectation is that the primary plan will pay that portion, and the insurer who is a secondary plan will only pay the amount left over after payment by the primary insurer. On the other hand, when an insurer uses the pay and pursue approach to COB savings, it expects to and does pay the full amount of the claim and, therefore, has expectation based on its experience and the facts of the case that it will recover by salvage a particular amount that the primary plan is responsible to pay. An estimated amount of unpaid losses is not a fair and reasonable estimate of amounts it will be required to pay if it includes amounts that the company, based on its experience and the facts of the case, expects are amounts that will be paid by another health plan and the secondary plan has no basis to recover. Such is the case when an insurer uses the pursue and pay approach to COB savings.

Blue Cross' argument that its dual liability gives it a salvage right ignores the standard set forth for unpaid losses discussed above. Even if Blue Cross is potentially liable for the full amount, the full amount of the claim would not be a fair and reasonable estimate of its unpaid losses, because based on Blue Cross' experience of using the pursue and pay approach and the facts of the case, Blue Cross expects that it will only have to pay the amount left over after payment by the primary plan. The standard mentioned for determining unpaid losses is not all potential amounts that the company may be liable to pay, but rather amounts that the company, in its experience and facts of the case, will be required to pay. Again, because estimated savage recoverable is a subpart used to determine unpaid losses, it must follow the same standard. This leads to the conclusion that estimated salvage recoverable must only include salvage that the company, based on its experience and facts of the case, expects to recover. When an insurer uses the pursue and pay approach to COB savings, it does not expect to recover the amount of the

19

claim paid by the primary plan and, therefore, it cannot constitute estimated salvage recoverable.

In conclusion, the authority explaining/defining salvage, estimated salvage recoverable in the context of paid losses, and the regulation regarding unpaid losses all support the Tax Court's holding that estimated salvage recoverable does not include COB savings under the pursue and pay approach because there is no expectation of payment of the full amount and, accordingly, no corresponding salvage right. The fact that some of the COB savings were Medicare related does not change the outcome- even if Blue Cross provided coverage for such claims, the Medicare related claims were handled in the same way as other claims with regard to the pursue and pay approach. Consequently, Blue Cross similarly had no expectation of paying amounts covered by Medicare as a primary plan, but would only pay the remainder of the claim after payment by Medicare in accordance with its "other coverage" provisions. Thus, no estimated salvage recoverable existed with regard to the Medicare related COB savings for the same reasons as non-Medicare related COB savings. A determination of whether Blue Cross' policies excluded all claims covered by Medicare or just amounts paid by Medicare is not necessary, but such a finding would only add support to the conclusion that Medicare related COB savings do not constitute estimated salvage recoverable.

C. Did the Tax Court err in holding that Blue Cross failed to qualify for the safe harbor provision and, thus, was not entitled to the special deduction?

Even though the COB savings did not constitute estimated salvage recoverable, the safe harbor provision may nevertheless entitle Blue Cross to the deduction if its argument on the safe harbor provision is accepted. As will be explained further below, Blue Cross argues that it is entitled to the deduction under the safe harbor provision even if COB savings do not qualify as

estimated salvage recoverable because Blue Cross was in good faith and acted without fraud in claiming the deduction.

In light of the change in the tax law by 1990 OBRA, the Treasury Department issued official guidance in March 1991 on implementing the new tax law, which included a safe harbor provision. Proposed Treasury Regulation 1.832-4(e) required a tax payer claiming the special deduction to "establish to the satisfaction of the district director that the deduction represents only the discounted amount of non-admitted salvage recoverable that was actually taken into account by the taxpayer in computing losses incurred for . . ." the last taxable year beginning January 1, 1990. The proposed regulation also provided that this requirement is deemed to be met if the taxpayer files with the appropriate state regulatory authority, on or before July 15, 1991, a statement disclosing the extent to which non-admitted salvage recoverable was taken into account in computing losses paid or unpaid losses in the underwriting and investment exhibit of its 1989 annual statement.

While the proposed regulation was pending, the IRS issued IRS Announcement 91-106, which extended the date for filing the disclosure statement. Revenue Procedure 91-48 provided that for purposes of the safe harbor (in Treasury Regulation 1.832-4(e)) a taxpayer will be deemed to have taken salvage recoverable into account only if the taxpayer files a statement by September 16, 1991 with the insurance regulatory authority of the taxpayer's state of domicile disclosing the extent to which losses incurred for each line of business reported on the 1989 annual statement were reduced by estimated salvage recoverable. The revenue procedure provided that if the taxpayer complied with this requirement, then the amount claimed as a special deduction would not be adjusted by the district director absent fraud.

21

In January of 1992, the IRS issued final regulations concerning the safe harbor provision, Treasury Regulation 1.832-4(f)(2). The safe harbor provision in the final regulations was nearly identical to the proposed regulation, but the "absence of fraud" language was taken out and the regulation provided the following: the requirements of this section are deemed satisfied and the amount that the company reports as *bona fide* estimated salvage recoverable is not subject to adjustment by the district director if certain requirements are met.[10]  (Emphasis added).

The Tax Court held that Blue Cross' letter did not meet the safe harbor requirements because it did not begin to disclose to Texas insurance regulators the extent to which Blue Cross' losses that were incurred for each line of business, as reported in its 1989 annual statement, were reduced by estimated salvage recoverable. The Tax Court explained that no separate lines of business were disclosed and the words "estimated salvage recoverable" were not even used in the letter.

Blue Cross argues that its disclosure letter was adequate despite the fact that it did not list separate lines of business because Blue Cross only had one line of business–health insurance. Additionally, Blue Cross argues that the regulation did not require specific language to be used in the disclosure letter and, therefore, Blue Cross' failure to use the term "estimated salvage

---

[10] The final regulation reads as follows:

> (2) Safe Harbor.  The requirements of paragraph (f)(1) of this section are deemed satisfied and the amount that the company reports as bona fide estimated salvage recoverable is not subject to adjustment by the district director, if –
>
> (i) the company filed with the insurance regulatory authority of the company's state of domicile, on or before September 16, 1991, a statement disclosing the extent to which losses incurred for each line of business reported on its 1989 annual statement were reduced by estimated salvage recoverable.

recoverable" did not render the disclosure letter inadequate. According to Blue Cross, the language it used was more easily understood by an insurance regulator, who may not be familiar with specialized tax terms such as "estimated salvage recoverable," and the language used in Blue Cross' letter fulfilled the purpose of the requirement, to disclose the extent to which losses incurred as listed on its 1989 annual statement were reduced by estimated salvage recoverable.

On the other hand, Appellee argues that Blue Cross' disclosure letter was inadequate for the reasons cited by the Tax Court. It is Appellee's position that although Blue Cross only had one line of business, that did not excuse it from the requirement of disclosing the line of business. Furthermore, the Appellee argues that the letter did not show the extent to which losses incurred were reduced by estimated salvage recoverable on its 1989 annual statement. Rather, the letter stated that the "sole purpose" was to notify the insurance department of the amount of the special deduction Blue Cross claimed; however, there is no evidence that the insurance regulators had sufficient knowledge of the special tax deduction at issue to understand that taxpayer's reference to it meant that it had reduced its losses incurred by estimated salvage recoverable. Finally, Appellee asserts that the general language Blue Cross used, "for recoveries related to our losses incurred deduction," could have been referring to actual recoveries affecting the losses paid part of the losses incurred deduction. According to Appellee, the language used does not clearly indicate the recoveries are *estimated* amounts of *anticipated* future recoveries and, therefore, does not even fulfill the purpose of the regulation as Blue Cross asserts.

As Blue Cross points out, because the implementing regulation did not require that certain language be used in the disclosure letter in order to be in compliance, it would appear that as long as the purpose of the regulations was accomplished, that is, putting insurance regulators on notice

23

of the amount by which losses incurred was reduced by estimated salvage recoverable for 1989, the requirements were met.  However, it is not clear in this case that Blue Cross fulfilled the purpose of the requirements.  Blue Cross' disclosure letter cannot be fairly deemed to be in compliance with the regulation because the language it used was too broad to adequately inform the insurance regulator of the extent that Blue Cross' incurred losses were reduced by estimated salvage recoverable.  Blue Cross' disclosure letter simply stated the following: "[T]he sole purpose of this letter is to notify you that we have determined our special tax deduction to be 87% of $74,780,518 discounted at 96.1538% for recoveries related to our losses incurred deduction prior to 1990 and reported in the 1989 annual statement."  This language simply fails to make it clear that the $74,780,518 figure represents *estimated* amounts of *anticipated future* recoveries that was factored into its losses incurred calculation for 1989.  Therefore, Blue Cross did not meet the requirements  of the implementing regulation because its disclosure letter did not inform the state regulators of the extent to which its losses incurred deduction was reduced by estimated salvage recoverable.

As an additional reason why Blue Cross did not meet the safe harbor provision, the Tax Court explained that Blue Cross' calculation of its estimated salvage recoverable did not reflect "bona  fide" or genuine salvage recoverable and, therefore, Blue Cross' disclosure of that calculation would not satisfy the disclosure required for safe harbor relief.  The Tax Court applied the final regulation containing  the safe harbor and  made no mention of the changes in the wording of the safe harbor provision as set forth above.

Blue Cross argues that its disclosure letter did meet the requirements for the safe harbor

because it was prepared in good faith, in reliance upon professional tax advisors,[11] and contained sufficient information to notify the Texas Department of Insurance of the extent to which Blue Cross reduced its losses incurred by anticipated salvage. According to Blue Cross, at the time the disclosure letter was prepared and due to the state insurance department, the proposed revenue procedure provided that if the taxpayer met the disclosure requirement, the taxpayer will be deemed to have taken salvage recoverable into account before 1990 and the amount claimed as a deduction will not be adjusted "in the absence of fraud." Blue Cross asserts that it was not until four months after the deadline for filing the safe harbor disclosure statements that the IRS issued final regulations as to the implementation of the one time tax benefit. The safe harbor in the final regulations was identical to that of the proposed regulation, except that the "absence of fraud" language was replaced with the notation that the amount the taxpayer reported as "bona fide estimated salvage recoverable" would not be adjusted if the requirements of the regulations were met. The Tax Court applied the regulation as it appeared in its final form, requiring bona fide estimated salvage recoverable and, in doing so, Blue Cross argues that the Tax Court held its disclosure letter to a different, more restrictive standard than the standard in effect at the time the disclosure letter was filed by defining bona fide to mean genuine. It is Blue Cross' position that bona fide should have been interpreted to mean in good faith or without fraud, in which case,

---

[11] The Blue Cross and Blue Shield Association filed an amicus brief essentially making the same arguments as Appellant Blue Cross. In support of the argument that Blue Cross qualified for safe harbor relief, the Association describes in great detail the planning and meeting of various tax experts who crafted a sample letter, which was later relied on and used by various Blue Cross plans throughout the country. Appellee contends that this should not be considered because it contains new facts not contained in the record, citing *Smith v. United States*, 343 F.2d 539, 541 (5th Cir. 1965) for the proposition that a court of appeals cannot consider new factual material included in the brief of an amicus.

25

Blue Cross' reasonable good faith beliefs put it well within the bona fide requirement of the safe harbor. Even if defining bona fide as genuine is an appropriate standard for the safe harbor provision, Blue Cross argues that it cannot be held to the more restrictive standard when it relied on a published ruling at the time it submitted its disclosure letter.

With regard to the standard of review, Blue Cross argues that the safe harbor issue is not a factual issue, but a legal one and, therefore, the standard of review is de novo for this issue. It is Blue Cross' position that all relevant facts are undisputed and the Tax Court erred in interpreting the language of Revenue Procedure 91-48 and Proposed Treasury Regulation 1.832-4(e)(2), which provided the requirements to meet the safe harbor rule.

If Blue Cross' argument is followed that "absence of fraud" should be the standard, it would mean that companies that claimed the deduction for salvage recoverable for items that were not legally salvage recoverable would nevertheless be entitled to the deduction absent any fraud in claiming the item as salvage recoverable. Appellee argues that the safe harbor was intended to eliminate factual disputes about the *amounts* of salvage recoverable estimated, not to change for tax purposes, items that were not salvage recoverable into salvage recoverable. According to the Appellee, the safe harbor relied on the adverse consequences that would result to an insurance company from disclosing an adjustment to its reserves for estimated salvage recoverable, an item insurance regulators considered a fictional asset. The safe harbor thus considered a disclosure having potential adverse consequences for state regulatory purposes as a sufficient basis for dispensing with a challenge as to the *amount* of salvage recoverable claimed as a special deduction for federal tax purposes. Appellee explains that the final regulations did not change the standard, as Blue Cross argues, but rather clarified that the safe harbor could not

26

extend the deduction for estimated salvage recoverable to estimates of items that were not in fact salvage recoverable. Finally, Appellee criticizes Blue Cross' argument that the disclosure letter met requirements of the safe harbor because it was crafted in good faith by experts. Regardless of whether experts wrote the letter, Appellee contends that the disclosure letter simply does not meet the safe harbor requirements as described above, and experts' involvement has no effect on that determination. Additionally, Appellee asserts that the standard of review for this issue is clearly erroneous because it is an issue of fact.

The issue of whether "absence of fraud" or "bona fide" should be the appropriate standard is a legal issue. Adoption of the "absence of fraud" standard as Blue Cross argues it should be applied, would result in a safe harbor provision that allowed companies to take a deduction for items that were not under the law "estimated salvage recoverable," but nonetheless would qualify for the benefits as such because the claiming party believed in good faith that such items were estimated salvage recoverable. A safe harbor should not be applied in such a way that it results in changing the legal status of an item; rather, safe harbor provisions should be applied to allow parties to qualify for a benefit despite technical errors in the amount claimed, not the item claimed. Therefore, whether the standard is bona fide or absence of fraud, the safe harbor provision should be applied to protect discrepancies in amounts claimed, not items. Because Blue Cross did not claim items that legally constitute estimated salvage recoverable, it is not entitled to the deduction on the sole basis that it believed in good faith and without fraud that such items were estimated salvage recoverable. Applying the safe harbor in this way leads to the conclusion that the standard was not changed, but only clarified to reflect the purpose of a safe harbor provision.

27

## CONCLUSION

Having reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that Blue Cross was not entitled to the special deduction for its "estimated salvage recoverable" consisting of COB savings under the pay and pursue method and Blue Cross did not qualify for protection under the safe harbor provision. We accordingly AFFIRM the Tax Court's decision.

**AFFIRMED.**